# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARSENAL, INC., t/a ARSENAL ASSOCIATES; and 5301 LLC., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | No. 14-1289 |
| v. | : | |
| | : | |
| LARRY AMMONS; PETER AMMONS; MELISSA BULLARD; BEN AMMONS, AMMONS SUPERMARKET LLC; and WAKEFERN FOOD CORPORATION, | : | |
| Defendants. | : | |

September 28, 2017                                                                 Anita B. Brody, J.

## MEMORANDUM

Plaintiffs Arsenal, Inc. and 5301 LLC (collectively "Arsenal" or "Plaintiffs") bring suit against Defendant Wakefern Food Corporation ("Wakefern"), as well as Larry Ammons, Peter Ammons, and Ammons Supermarket LLC (the latter three constituting the "Ammons Defendants," and all four collectively the "Defendants") for promissory estoppel, tortious interference, and fraudulent misrepresentation.[1]  Arsenal claims the Defendants engaged in years of dishonest negotiations with Arsenal, negatively impacting Arsenal's proposed real estate development project.  Both parties filed cross-motions for summary judgment.  For the reasons discussed below, I will grant the Defendants' motion for summary judgment, and I will deny Plaintiffs' motion for summary judgment.

---

[1] Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

# I.  BACKGROUND

The following facts are either not in dispute, or are presented in the light most favorable to the non-moving party.  Because I conclude that, even viewing the facts in the light most favorable to the Plaintiffs, they are not entitled to summary judgment, I present the facts as though the Plaintiffs are the non-moving party.

In 1983, Mark Hankin, through an entity that is now known as Arsenal, Inc., purchased an 87-acre portion of the former Frankford Arsenal ("the Arsenal") with the intent to develop the northern half into a shopping center.  Pl.'s Statement of Undisputed Material Facts ¶ 1, ECF No. 155.  In search of an anchor tenant,[2] in 2002 Arsenal's broker, Legend Properties, reached out to the Wakefern Cooperative to inquire about opening a supermarket location at the shopping center.  Pl.'s Statement ¶¶ 3-4.  Wakefern owns and operates the ShopRite trade name, and is organized as a cooperative corporation.  Def.'s Statement of Undisputed Material Facts ¶ 5, ECF No. 152.  The members of the cooperative negotiate independently to open supermarket locations bearing the ShopRite name.

## A.  Negotiations Between Arsenal and the Ammons Defendants

The Ammons Defendants are members of the Wakefern Cooperative.  Pl.'s Statement ¶ 2.  On or about March 9, 2004, the Ammons Defendants were designated the approved Wakefern operator for the proposed shopping center at the Arsenal by Wakefern's Site Development Committee ("SDC").  Pl.'s Statement ¶ 5.  When the SDC approves a member for a particular location, that member has the exclusive right to negotiate at that location on behalf of ShopRite.  *See* Daly Dep. 99:5-22, Nov. 16, 2016, Braverman Decl. Ex. 6.  Larry Ammons had first learned of the proposed shopping center at the Arsenal through Richard Matwes at Wakefern's Real

---

[2] An anchor tenant is a major tenant which is the main draw of a shopping center.  It is meant to draw shoppers to the location in order to increase the center's customer base.  *See* Aristone Dep. 172:2-4, June 2, 2016, Braverman Decl. Ex. 14, ECF No. 156.

Estate Department. Pl.'s Statement ¶ 4. The SDC approved the shopping center at the Arsenal as a Member Identified Site, meaning the Ammons Defendants were the only Wakefern cooperative member who would be able to negotiate on the site. *See* Braverman Decl. Ex. 4, at 1, ECF No. 156.

After preliminary negotiations, the Ammons Defendants and Arsenal began to negotiate a Letter of Intent. Arsenal was represented by Jim DePetris and Maria Aristone of Legend Properties, and Wakefern and the Ammons Defendants negotiated through Tish Daly and Joe Gilchrist. All the parties involved in negotiations were highly sophisticated. Wakefern owns the name and trademark of a major regional supermarket, two of which are operated by the Ammons Defendants. *See* Def.'s Statement ¶¶ 4-5. Similarly, those involved with Arsenal all had extensive experience in real estate development, especially Mark Hankin whose management company had been involved in substantial development projects in the past. *See* McCormick Decl. Ex. 2, at 2, ECF No. 153; Aristone Dep. 119:21-22, June 2, 2016, Braverman Decl. Ex. 14; DePetris Dep. 13:9-14, May 17, 2016, McCormick Decl. Ex. 70.

Between November 16, 2010 and May 9, 2012, the parties traded no less than six draft Letters of Intent, Pl.'s Statement ¶ 19, each letter containing language informing the other that the letters were not meant to be binding agreements. Arsenal's November 16, 2010 proposed Letter of Intent provided:

> This letter of intent is for presentation purposes only. It is not to be considered binding on any party unless a mutually acceptable Lease Agreement is fully executed by both parties. We reserve the right to continue to market this property and al[l] of the properties within The Shopping Center at the Arsenal. No reservations or rights are deemed to be granted to any party with respect to this or any other property within The Shopping Center at the Arsenal.

McCormick Decl. Ex. 9, at 6. The Defendants' December 15, 2010 response to the November 16, 2010 Letter of Intent contained the provision: "It is expressly understood that no contract

shall exist until a formal lease is executed and delivered by both parties." McCormick Decl. Ex.

10, at 4. After discussions with Arsenal, the Defendants sent a revised Letter of Intent on August

3, 2011, which retained the previous language: "It is expressly understood that no contract shall

exist until a formal lease is executed and delivered by both parties." Braverman Decl. Ex. 30, at

4. On or about October 11, 2011, Arsenal responded with a counter Letter of Intent which

contained the following language:

> This letter . . . is not legally binding on either party. The parties will be bound
> only when the Lease contemplated by this Letter of Intent has been approved and
> executed . . . . Neither the negotiation nor execution of this letter, and/or the
> negotiation, preparation, revision or delivery of the proposed lease for
> examination and discussion, shall in any event be deemed to create any obligation
> or liability of either party, and neither party hereto shall have any obligation or
> liability to the other party whatsoever at law or in equity (including any claims for
> contractual breach, detrimental reliance, promissory estoppel, or otherwise) unless
> . . . both parties shall have executed and delivered a lease. Notwithstanding past,
> present, or future written or oral indications of assent or indications of results or
> negotiations . . . it is agreed that no legal obligations will be created unless this
> transaction has been finally approved . . . . Neither party shall have any legal
> rights or claims against the other party by reason of any action taken, statements
> made, writings delivered or other matters undertaken by a party in reliance upon
> this non-binding Letter of Intent, including . . . any expenditure of funds, partial
> performance of transactions contemplated herein, or any other actions of a party.

Braverman Decl. Ex. 31, at 3-4. On or about March 23, 2012, Arsenal sent the Defendants

another Letter of Intent which contained a provision similar to its November 16, 2010 Letter of

Intent:

> This Letter of Intent is for presentation purposes only. It is not to be considered
> binding on either party unless a mutually acceptable lease agreement is fully
> executed by both parties. We reserve the right to continue to market this property
> to other parties. No reservations or rights are deemed to be granted to any party
> with respect to the proposed supermarket building and/or the proposed Pad Site
> by this Letter of Intent.

McCormick Decl. Ex. 17, at 5. Four days later, on March 27, 2012, the Defendants rejected

Arsenal's proposed Letter of Intent, returning Arsenal's letter with their proposed changes, but

retaining the language above. Def.'s Statement ¶ 19. At no point did the parties execute any of the Letters of Intent.

Throughout these negotiations, the parties had sharp disagreements on multiple material terms, notably the base rent and the distribution of tax benefits. *See* McCormick Decl. Ex. 9. Mark Hankin's and Larry Ammons' negotiating styles also clashed. *See* McCormick Decl. Ex. 32, at 1; Braverman Decl. Ex. 15. Arsenal complained that Larry Ammons would "retrade" key issues, often backtracking from oral understandings in written correspondence. Braverman Decl. Ex. 50. Frustrated with Larry Ammons, Arsenal spoke with another member of the Wakefern Cooperative, George Zallie, Jr., to discuss the possibility of Mr. Zallie substituting for the Ammons Defendants as the approved Wakefern operator. Arsenal spoke with George Zallie, Jr. two or three times in person and multiple times over the phone. Aristone Dep. 24:19-22, June 2, 2015, Braverman Decl. Ex. 14. During those meetings, George Zallie, Jr. expressed interest in the Arsenal project. Aristone Dep. 24:15-16, June 2, 2016, Braverman Decl. Ex. 14. As a Member Identified Site, Larry Ammons exercised considerable control as to whom from Wakefern negotiated with Arsenal, and therefore he was able to successfully prevent George Zallie, Jr. from engaging in any substantive negotiations with Arsenal. *See* Braverman Decl. Ex. 9.

As Arsenal's frustration with the pace of negotiations grew, Joe Gilchrist and Tish Daly continued to reassure Arsenal that Wakefern had significant interest in entering into a lease with Arsenal. Among these reassurances were statements by the Defendants' representatives that it was Wakefern's "intent to have a ShopRite built and in operation at the shopping center at the Arsenal site . . . . [T]hat they wanted the site; that they considered [it] a Wakefern development, where they were going to put their store[,]" Hankin Dep. 26:3-8, 196:12-16, October 14, 2016,

Braverman Decl. Ex. 16, and that "Arsenal was the deal to make." Jim DePetris Dep. 135:9-13, May 17, 2016, Braverman Decl. Ex. 2. But even within the Defendants' own camp, some had grown frustrated with Larry Ammons' negotiation style. In conversations with Arsenal, Joe Gilchrist and Tish Daly both told Arsenal that they were going to give Larry Ammons an ultimatum that he either needed to move forward with a lease, or drop out of the negotiations. *See* Braverman Decl. Ex. 43, at 1; Braverman Decl. Ex. 51, at 2. In the end, the Ammons Defendants remained the only party approved by Wakefern to negotiate at shopping center at the Arsenal.

On May 9, 2012, Mark Hankin, Jim DePetris, and Maria Aristone met with the Ammons Family and Joe Gilchrist at the Ammons family's Aramingo Avenue ShopRite. *See* McCormick Decl. Ex. 21. At this meeting, the parties agreed that they would bypass the Letter of Intent process and proceed directly to negotiating a lease. Pl.'s Statement ¶ 22. Maria Aristone recalls all the terms of the lease being agreed upon, prompting Joe Gilchrist to say "[l]et's enter into a lease agreement[,]" because signing the lease was all that was left to be done. Aristone Dep. 71:18-72:13, June 2, 2016, Kaplan Decl. Ex. 5, ECF No. 162.

Nevertheless, the parties left the meeting with vastly different interpretations of the significance of bypassing a Letter of Intent and negotiating a lease. The Defendants thought that bypassing a Letter of Intent would speed up an otherwise arduous process because the Defendants felt the parties "couldn't get anywhere with the letter of intent." Gilchrist Dep. 120:19-121:7, Nov. 15, 2016, McCormick Decl. Ex. 20. Arsenal, however, left the meeting believing the parties had come to an agreement in principle. Mark Hankin believed that they bypassed the Letter of Intent process because "the business terms had been discussed and seemed to be mutually agreeable . . . ." Hankin Dep. 185:17-20, Oct. 14, 2016, Braverman Decl. Ex. 16.

Mr. Hankin requested that the Ammons Defendants send over one of their recent leases from another ShopRite location, assuring the Defendants that he could agree to those terms with only site-specific changes needing to be made.  Braverman Decl. Ex. 34, at 2.

Believing the shopping center at the Arsenal was going to be anchored by ShopRite, Arsenal had suspended its effort to find another anchor, and instead diverted its efforts to courting other tenants to fill out the rest of the shopping center.[3]  *See* Hankin Dep. 15:15-21, Oct. 28, 2016, Braverman Decl. Ex. 17.  Some of these negotiations resulted in Letters of Intent being executed between Arsenal and the prospective tenants during 2013.  *See* Braverman Decl. Ex. 71-72.

Despite Arsenal's belief that there was an agreement in principle, the parties kept negotiating over the substance of the lease, and eventually reverted to the exchange of Letters of Intent.  *See* McCormick Decl. Ex. 28; Braverman Decl. Ex. 63, at 2.  Mark Hankin had waited for months for the Defendants to send over a sample lease to close the deal, but when negotiations eventually broke down between the parties, one had never been sent.  *See* McCormick Decl. Ex. 35, at 2.

**B.  The Ammons Defendants' Negotiations at the Harbison Site**

In the summer of 2012, the Ammons Defendants became aware of a potential new shopping center (the "Harbison Site") less than a mile from the Arsenal.  Pl.'s Statement ¶ 27; Larry Ammons Dep. 24:8-11, Nov. 23, 2016, Braverman Decl. Ex. 3.  While they were still

---

[3] The Defendants contend that Arsenal continued searching for an alternative anchor tenant throughout the entire negotiation process.  It is true that the record contains a number of letters from Arsenal to Wal-Mart, BJ's Wholesale Club, A&P Super Fresh, and Costco, seeking their tenancy at the shopping center at the Arsenal.  See McCormick Decl. Ex. 42, 44-46, 49, 51.  There is a gap in these letters, however, between April 14, 2011 and November 27, 2012 which, in the light most favorable to Arsenal, is construed as a suspension of their efforts to secure a tenant other than ShopRite.

negotiating with Arsenal, the Ammons Defendants opened negotiations with representatives from the Harbison Site. Pl.'s Statement ¶ 33.

From at least the May 9, 2012 meeting, Arsenal had suspended its search for another anchor tenant. Frustrated with negotiations, however, on or about September 11, 2012 Arsenal informed the Defendants that they were going to begin pursuing other potential anchors. Despite still hoping that the parties could come to a mutually acceptable agreement, they were not committed to entering into a lease with the Defendants if the terms left Arsenal financially exposed. Braverman Decl. Ex. 36.

As early as October 31, 2012, Arsenal became cognizant of the possibility that a competing site had reached out to the Ammons Defendants about opening a ShopRite. Mark Hankin informed Tish Daly and Joe Gilchrist that he was aware "that Mr. A[m]mons may have received a submission through another broker for a potentially competing site," but that he did "not know if Mr. A[m]mons [was] considering th[at] location . . . ." McCormick Decl. Ex. 25, at 1.

On or about May 7, 2013, the Ammons Defendants signed a Letter of Intent with the Harbison Site. Pl.'s Statement ¶ 34. Arsenal claims that if it had been aware of the existence of this Letter of Intent, it would have effectively put an end to the prospect of ShopRite anchoring their shopping center because Wakefern would not put two supermarkets within a mile of each other. *See* Aristone Dep. 229:18 – 230:14, June 2, 2016, Braverman Decl. Ex. 14.

By August 6, 2013, Mark Hankin's suspicions that Ammons had been negotiating with the Harbison Site had grown. He confronted Tish Daly and Joe Gilchrist in an email alleging that he had "heard from more than one source that Larry Ammons and his family ha[d] committed to opening a store . . . at Harbison and Tulips Street, not far from the Arsenal."

Braverman Decl. Ex. 63, at 8.  These sources included multiple local councilmembers, members of the Philadelphia Department of Commerce, a representative from Giant Supermarkets, and another potential tenant.  Braverman Decl. Ex. 63, at 8; Braverman Decl. Ex. 64, at 1.

On or about August 27, 2013, Mark Hankin sent another email to Tish Daly and Joe Gilchrist explaining that although he recognized that "both [parties were] operating in an open and competitive environment and [were] permitted to negotiate with whomever they please," in light of the recent information they had received regarding the Defendants' negotiations at the Harbison Site, they had "substantial concerns about the Ammons family's *bona fides* . . . ." McCormick Decl. Ex. 35, at 3.

Even after Mark Hankin's emails, and a subsequent email from Maria Aristone alleging the same, the Defendants continued to push negotiations with Arsenal by adamantly assuring them that the Defendants were not negotiating at the Harbison Site.  *See* Braverman Decl. Ex. 64, at 1; Hankin Dep. 86:7-12, Oct. 28, 2016, Braverman Decl. Ex. 17; Aristone Dep. 232:18-233:18, June 2, 2016, Braverman Decl. Ex. 14.  This was untrue, as the Defendants were not only negotiating with the Harbison Site, but had signed a Letter of Intent.

Still, Tish Daly and Joe Gilchrist continued negotiating with Arsenal through January of 2014.  Pl.'s Statement ¶ 35; *see also* Braverman Decl. Ex. 62.  Six months later, in June of 2014, the Defendants signed a lease to open a ShopRite at the Harbison Site.  Pl.'s Statement ¶ 40.  The shopping center at the Arsenal never materialized, and the property was ultimately sold back to the City of Philadelphia.  *See* McCormick Decl. Ex. 7.

On October 7, 2013, Arsenal filed a complaint in the Philadelphia Court of Common Pleas against the Ammons Defendants, as well as Ben Ammons and Melissa Bullard, alleging promissory estoppel, tortious interference, fraud, negligent misrepresentation, and unfair

competition.  *See* ECF No. 1.  On February 11, 2014, Arsenal filed an amended complaint adding Defendant Wakefern and a claim of Civil Conspiracy.  *See* ECF No. 1.  The case was subsequently removed to this Court on March 3, 2014.  *See* ECF No. 1.  The Defendants moved to dismiss the Complaint on April 4, 2014.  *See* ECF No. 11, 12.  On December 1, 2014, I dismissed all of Arsenal's claims against Ben Ammons and Melissa Bullard (associates of the Ammons Defendants), as well as Arsenal's claims for negligent misrepresentation, unfair competition, and civil conspiracy in their entirety.  *See* ECF No. 37.  Following discovery, the parties filed cross-motions for summary judgment on Arsenal's remaining promissory estoppel, tortious interference, and fraud claims.  *See* ECF. No. 152, 155.

## II.  LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The materials

in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

 "The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.   DISCUSSION

Arsenal's complaint has three remaining counts:  promissory estoppel, tortious interference with prospective contractual relations, and fraudulent misrepresentation.

## A.  **Promissory Estoppel**

Arsenal's promissory estoppel claim alleges that in reliance on two of the Defendants' promises, Arsenal postponed its efforts to locate another anchor for the shopping center at the Arsenal.  Arsenal first alleges that the Defendants promised that they would negotiate with Arsenal in good faith.  In the alternative, Arsenal alleges that the Defendants promised that they would enter into a lease with Arsenal to open a ShopRite location at the shopping center at the Arsenal.

Pennsylvania has accepted § 90 of the Restatement (Second) of Contracts for promissory estoppel claims which provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  *Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets Inc.*, 636 A.2d 156, 160 (Pa. 1994) (quoting Restatement (Second) of Contracts § 90 (1981)).  The Pennsylvania Supreme Court explained that:

> In order to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.

*Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000).

Both of Arsenal's theories of promissory estoppel fail the above test under the first prong. Promissory estoppel's first prong requires both an express promise, *C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988), and reasonable reliance on that promise, *Green v. Interstate United Management Services Corp.*, 748 F.2d 827, 830 (3d Cir. 1984). Arsenal's promissory estoppel claim alleging a promise to negotiate in good faith fails because

there is nothing in the record to indicate that the Defendants ever made a promise to negotiate in good faith. Arsenal's alternative argument that the Defendants promised to enter into a lease fails because Arsenal could not have reasonably relied on the Defendants' promise.

### 1. Promise to Negotiate in Good Faith

While the Pennsylvania Supreme Court has yet to find a cause of action for breach of an agreement to negotiate in good faith, the Third Circuit has predicted that Pennsylvania would accept such a rule if the agreement otherwise met the requirements of an enforceable contract. *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986). Whether the Pennsylvania Supreme Court would extend this to a cause of action in promissory estoppel, however, is an open question. Even assuming that they would, Arsenal's claim still fails.

The first element of promissory estoppel requires there to be an express promise. A "broad and vague implied promise" will not suffice. *C & K Petroleum Prods*, 839 F.2d at 192. "Even an express promise must indicate with 'reasonable certainty' the intent of the parties." *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007); *see also Channel Homes Ctrs. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986) (requiring that agreements to negotiate in good faith be "sufficiently definite to be enforced"). In *Burton*, the plaintiff rested its promissory estoppel claim on the defendant's statement that they were "going to move ahead with [Burton] as long as everything that [they were] doing passe[d] the Revolution Power Test[,]" which was subsequently passed. *Burton*, 502 F. Supp. at 439. Such a promise, although express, was too vague to qualify as enforceable because it fell short of expressing the intent of the parties with reasonable certainty by failing to indicate key terms. *Id.*

Arsenal alleges that the parties had agreed to negotiate in good faith. "The obligation to negotiate in good faith has been generally described as preventing one party from, 'renouncing

the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'" *Jenkins v. Cnty. of Schuylkill*, 658 A.2d 380, 385 (Pa. Super. Ct. 1995) (quoting *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 158 (7th Cir. 1989)), *appeal denied*, 666 A.2d 1056 (Pa. 1995). The statements which Arsenal claims induced its reliance, however, contain even less indicia of the intent of the parties than those made in *Burton*. Arsenal puts forth an abundance of statements made by the Defendants that it contends constitute a promise to negotiate in good faith. Among these statements are that "it was [Wakefern's] intent to have a ShopRite built and in operation at the shopping center at the Arsenal site[,]" Hankin Dep. 26:3-8, Oct. 14, 2016, Braverman Decl. Ex. 16, "that they wanted the site; that they considered [the shopping center at the Arsenal] a Wakefern development, where they were going to put their store[,]" Hankin Dep. 196:13-16, Oct. 14, 2016, Braverman Decl. Ex. 16, that Wakefern was "still very interested in the location[,]" Braverman Decl. Ex. 24, at 1, and that Wakefern was "committed to [their] future development at the Arsenal project." Braverman Decl. Ex. 27, at 2.

These statements are too vague to qualify as enforceable promises. An intent to negotiate in good faith cannot be surmised from these statements alone. One cannot say these statements even relate to negotiating in good faith. Statements such as these are more properly characterized as expressions of interest rather than promises not to renounce the deal or abandon negotiations. Arsenal's theory of promissory estoppel grounded in alleged promises to negotiate in good faith fails.

## 2. Promise to Enter Into a Lease

Arsenal next contends that the Defendants' promise to enter into a lease is an enforceable promise. To survive summary judgment on this theory, Arsenal must present sufficient evidence

from which a reasonable jury could find that reliance upon the promise was reasonable. *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993). "[T]he degree of sophistication of the parties and the history, if any, behind the negotiation process are relevant factors in ascertaining reasonableness." *Greenberg*, 816 F. Supp. at 1056. Taking these considerations into account, no reasonable fact finder could conclude that Arsenal's reliance on the Defendants' promise to enter into a lease was reasonable.

Arsenal relies on a statement made by Joe Gilchrist at a meeting on May 9, 2012 as a promise to enter into a lease. According to Arsenal, after allegedly agreeing on the principle terms of the lease, Mr. Gilchrist said "[l]et's enter into a lease agreement." Aristone Dep. 71:18-72:13, June 2, 2016, Kaplan Decl. Ex. 5.

Importantly, both parties in this case are highly sophisticated in the realm of real estate development, each having worked on numerous real estate projects in the past. Moreover, every exchanged Letter of Intent contained language that put the parties on notice that anything short of a written lease would not be a binding agreement. In particular, in a Letter of Intent from Arsenal to the Defendants prior to the May 9, 2012 meeting, Arsenal explicitly denounced the possibility of the cause of action they are currently pursuing, stating:

> The parties will be bound only when the Lease contemplated by this Letter of Intent has been approved and executed . . . . neither party hereto shall have any obligation or liability to the other party whatsoever at law or in equity (including any claims for contractual breach, detrimental reliance, promissory estoppel, or otherwise) unless and until such time as both parties shall have executed and delivered a lease. Notwithstanding past, present, or future written or oral indications of assent or indication of results or negotiations or agreements to some or all matters then under negotiation . . . .

Braverman Decl. Ex. 31, at 3-4. Although this Letter of Intent was never executed, the fact that it was drafted by Arsenal indicates that they were well aware of the legal framework supporting their negotiations with the Defendants.

Arsenal's reliance on oral statements made by the Defendants while simultaneously being aware that any final agreement would have to be reduced to writing in order to make it enforceable makes Arsenal's reliance unreasonable as a matter of law given the sophistication of the parties and the communications they previously exchanged. *See Thatcher's*, 636 A.2d at 160 (finding that "it was unreasonable for Thatcher's to proceed on the basis of indefinite oral assurances" in the absence of a written agreement with the landlord to not place a competing pharmacy next door); *cf. Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Invs.*, 951 F.2d 1399, 1412 (3d Cir. 1991) (granting summary judgment based on the lack of justifiable reliance because "sophisticated businessmen . . . . never had any intention of closing [an agreement] on handshakes").

Accordingly, I will grant Summary Judgment on Arsenal's promissory estoppel claim against all the Defendants.

**B.  Tortious Interference**

Arsenal next claims that the Defendants tortiously interfered with prospective leases they had negotiated with non-anchor tenants, and also prevented them from entering into a lease with fellow Wakefern member George Zallie, Jr.  In Pennsylvania, tortious interference with existing or prospective contractual relationships requires the plaintiff to prove:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009) (citing

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998)).  Both of

Arsenal's claims fail the above test.

### 1.  Prospective Leases

While Arsenal was negotiating with the Defendants, Arsenal was simultaneously

negotiating with third-parties to fill out the shopping center's other storefronts.  Arsenal claims

that the Defendants' failure to enter into a lease with Arsenal constitutes tortious interference

with the prospective leases Arsenal was negotiating with the shopping center's other prospective

tenants. To succeed, Arsenal must show that the Defendants' decision was neither privileged, nor

justified.  *Id.*  In the usual case, the interference is an affirmative act.  *See, e.g.*, *Assembly Tech.*

*Inc. v. Samsung Techwin Co., Ltd.*, 695 F. Supp. 2d 168 (E.D. Pa. 2010).  In this case, the

claimed interference was the Defendants' failure to enter into a lease.  To show an absence of

privilege or justification, therefore, Arsenal must show that the Defendants were under some

requirement to enter into a lease with Arsenal.

While "[w]hat is or is not privileged conduct in a given situation is not susceptible of

precise definition[,]" *Alder, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 A.2d 1175,

1183-84 (Pa. 1978), "a person or entity is generally free to choose whether or not to do business

with another[,]"  *Int'l Hobby Corp. v. Rivanossi S.P.A.*, No. Civ.A.96-3082, 1998 WL 376053, at

*7-8 (E.D. Pa. June 30, 1998) (citing Restatement (First) of Torts § 762 (1939)), *aff'd*, 203 F.3d

817 (3d Cir. 1999); *see also* Restatement (Second) of Torts § 766, Comment b (1979)

("Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the

conduct is not regarded as improper . . . .").  As explained in the promissory estoppel section, the

Defendants were under no obligation to enter into a lease with Arsenal.  Since the Defendants

had no obligation to enter into a lease, the Defendants cannot be held liable when their decision not to do so prevented Arsenal from finalizing leases with third parties. *Cf. Green*, 748 F.2d at 831 (holding that a parent company was privileged in preventing its wholly-owned subsidiary from entering into a lease with the plaintiff). The Plaintiffs do not cite any case that permits recovery against a defendant for tortiously interfering with a prospective contract by electing not to do something they had no legal obligation to do. Arsenal, in essence, seek to use the claim of tortious interference to police their business negotiations and insure against the downstream consequences of failing to come to an enforceable agreement, something this cause of action cannot do.

### 2. Negotiations with George Zallie, Jr.

Arsenal's second tortious interference theory alleges that the Ammons Defendants improperly interfered with Arsenal's attempt to negotiate with George Zallie, Jr. As this claim relates to a prospective contractual relationship, Arsenal must show a "reasonable likelihood or probability" that that a lease with George Zallie, Jr. would have materialized. *Glenn*, 272 A.2d at 898-99. While a "reasonable likelihood" does not require a contractual right, it requires more than "a mere hope that there will be a future contract." *Acumed*, 561 F.3d at 213. The preliminary negotiations that Arsenal had with George Zallie, Jr. are insufficient to show a reasonable likelihood that the parties would have entered into a lease.

Arsenal's negotiations with George Zallie, Jr. were still in their infancy at the time Larry Ammons prevented George Zallie, Jr. from negotiating with Arsenal. In her deposition, Maria Aristone claimed that she had "met with [George Zallie, Jr.] two or three times in person, and Jim and [she] spoke to him several times over the phone." Aristone Dep. 24:19-22, June 2, 2016, Braverman Decl. Ex. 14. During those meetings, she claimed that he "very much wanted . . . to

be in the Arsenal project." Aristone Dep. 24:15-16, June 2, 2016, Braverman Decl. Ex. 14. Jim

DePetris characterized George Zallie, Jr. as having "definite interest" in the shopping center at

the Arsenal. DePetris Dep. 164:23, May 17, 2016, Braverman Decl. Ex. 2. Beyond that, the

record is devoid of anything that would even remotely indicate that there was a reasonable

likelihood that George Zallie, Jr. would enter into a lease with Arsenal. What the record does

indicate is that George Zallie, Jr. had an interest in entering into negotiations with Arsenal, but

there is nothing to suggest that the parties had discussed terms, or that negotiations had

progressed anywhere past the most preliminary of stages. Arsenal had nothing more than a mere

hope of a future contract with George Zallie, Jr., and their contention to the contrary is nothing

more than wishful thinking. Without a prospective contract, Arsenal cannot make out a claim for

tortious interference.

Therefore, I will grant summary judgment on Arsenal's tortious interference claim in its

entirety.

### C. Fraudulent Misrepresentation

Fraudulent misrepresentation in Pennsylvania requires proof of six elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made
> falsely, with knowledge of its falsity or recklessness as to whether it is true or
> false; (4) with the intent of misleading another into relying on it; (5) justifiable
> reliance on the misrepresentation; and (6) the resulting injury was proximately
> caused by the reliance.

*Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). These elements must be proven by "evidence that

is clear, direct, precise and convincing." *Knop v. McMahan*, 872 F.2d 1132, 1140 (3d Cir. 1989)

(quoting *Carlson v. Sherwood*, 416 Pa. 286, 287, 206 A.2d 19, 20 (1965)).

Arsenal alleges that the Defendants made four separate misrepresentations that they

contend constitute fraud. First, Arsenal alleges that the Defendants falsely represented that they

were negotiating in good faith (the "Good Faith Misrepresentation"). Second, they claim that the Defendants were untruthful when they denied that they had signed a Letter of Intent at the Harbison Site (the "Letter of Intent Misrepresentation"). Third, Arsenal asserts that Joe Gilchrist and Tish Daly informed Arsenal that they were attempting to remove Larry Ammons as the approved Wakefern operator for the shopping center at the Arsenal with no intention of actually making such an attempt (the "Removal Misrepresentation"). Finally, Arsenal claims that the Defendants failed to tell Arsenal they had committed to a lease at the Harbison Site (the "Harbison Site Omission").

Arsenal's fraud claim based on the Good Faith Misrepresentation and the Letter of Intent Misrepresentation fail because Arsenal was not justified in relying on the Defendants' representations under the fifth prong of the test—justifiable reliance. Arsenal's claim based on the Removal Misrepresentation fails because there is no evidence that the Defendants' statements were false when made. Arsenal's final claim based on the Harbison Site Omission cannot serve as a fraudulent omission because the Defendants were under no duty to tell Arsenal of their negotiations at the Harbison Site.

### 1. Good Faith Misrepresentation

Arsenal's first contention is that the Defendants misrepresented that they were negotiating in good faith despite concurrently negotiating at the Harbison Site. In support of that contention, Arsenal cites to a deposition of Joe Gilchrist in which Mr. Gilchrist admits to telling Arsenal that they were negotiating in good faith during April and May of 2013:

> Q: But clearly, you were telling Legend and through Legend Mr. Hankin that you were still negotiating in good faith to get a deal done at the Arsenal?
> . . .
> A: Yes, because that was the task that was given to me by Wakefern when I first joined the company and until Wakefern said no or until Larry Ammons said no, my task was to attempt to get a deal done at Arsenal.

Gilchrist Dep. 191:23-192:9, Nov. 15, 2016, Braverman Decl. Ex. 7. As discussed earlier, negotiating in good faith means refraining from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Jenkins*, 658 A.2d at 385 (quoting *Apothekernes*, 873 F.2d at 158). In order to succeed on a claim of fraud, Arsenal must establish that justifiable reliance on the Defendants' false statements. *Gibbs*, 647 A.2d at 889.

"To be justifiable, reliance upon the representation of another must be reasonable." *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002). "Whether reliance on an alleged misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false." *Id.* (quoting *Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. 455, 460 (E.D. Pa. 1994)). "[T]he recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but . . . he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious. *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007); *see also Emery v. Third Nat. Bank of Pittsburgh*, 162 A. 281, 284 (Pa. 1932) ("If a man knows the truth about a representation, he is neither deceived nor defrauded, and any loss he may sustain is in effect self-inflicted."). This is because "knowledge negates the *affirmative element of reliance* . . . ." *City of Philadelphia v. Lead Indus. Ass'n*, No. 90-7064, 1992 WL 98482, at *3 n.4 (E.D. Pa. Apr. 23, 1992).

By 2013, these highly sophisticated parties had been in substantive negotiations for over three years. Negotiations were often terse, and had been deteriorating for some time. Mark Hankin had repeatedly expressed his frustration over what was, in his view, Larry Ammons attempting to renegotiate terms that had already been orally agreed upon, resulting in

"extraordinary delays." Braverman Decl. Ex. 63, at 9; *see also* Braverman Decl. Ex. 27, at 3. Put plainly, negotiations were not going well. Neither party should have had any expectation that an agreement would inevitably be reached. Arsenal should have known that the Defendants were not required to sign a lease with them, and that the Defendants very well may abandon negotiations with them notwithstanding Joe Gilchrist's assurances to the contrary.

Moreover, Arsenal was aware of the parties' non-exclusive negotiating environment as evidenced by Mark Hankin's email to the Defendants in August of 2013 recognizing that both parties "were operating in an open and competitive environment and [were] permitted to negotiate with whoever they please[d.]" McCormick Decl. Ex. 35, at 3. Mr. Hankin's awareness is unmistakable because on or about September 11, 2012, Arsenal told the Defendants that Arsenal would no longer be negotiating exclusively with the Defendants, and would instead begin negotiating with other potential anchors. Braverman Decl. Ex. 36, at 2. Accordingly, on or about November 27, 2012, Arsenal executed on its promise and began reaching out to other supermarkets. McCormick Decl. Ex. 46. To then turn around and claim Arsenal was justified in relying on Joe Gilchrist's statements that the Defendants were negotiating in good faith is incredible. By April and May of 2013, the behavior of both parties had made it so blatantly obvious that neither party was negotiating in good faith such that no reasonable fact finder could conclude that Arsenal justifiably relied upon Joe Gilchrist's statements. As a result, Arsenal cannot maintain an action for fraud based on Joe Gilchrist's statements that the Defendants were negotiating in good faith.

## 2. Letter of Intent Misrepresentation

Arsenal also argues that the Defendants' affirmative representations that they had not signed a Letter of Intent with the Harbison Site constitute fraud. On or about May 7, 2013, the

Defendants signed a Letter of Intent at the Harbison Site, but when confronted in August of 2013 the Defendants denied being committed to opening a ShopRite location at the Harbison Site. As with the statements above, Arsenal must show that they justifiably relied upon the Defendants' misrepresentations to succeed. *Gibbs*, 647 A.2d at 889.

In addition to the parties' deteriorating negotiations evident throughout this case, Arsenal had long been aware that the Defendants may have been negotiating at the Harbison Site. By the time the Defendants represented that they had not signed a Letter of Intent with the Harbison Site in August of 2013, Arsenal had been informed by multiple local councilmembers, members of the Philadelphia Department of Commerce, a representative from Giant Supermarkets, and another unnamed potential tenant that the Defendants had, in fact, committed to the Harbison Site. Braverman Decl. Ex. 63, at 8; Braverman Decl. Ex. 64, at 1. The falsity of the Defendants' statements was obvious. It was Arsenal's choice to turn a blind eye to the overwhelming evidence that the Defendants had committed to the Harbison Site, and as a result Arsenal cannot claim justifiable reliance on the Defendants' representations that they had not committed.

### 3. Removal Misrepresentation

Arsenal's next allegation of fraud hinges on Joe Gilchrist and Tish Daly's stated intention to perform a promised act, namely to attempt to remove Larry Ammons from the negotiations between Wakefern and Arsenal. In order to be actionable as fraud, statements of present intention to do a particular act in the future must be fraudulent when made, meaning that the promisor must not intend to take the promised action at the time he or she makes the promise. *See Mellon Bank*, 951 F.2d at 1410. "Non-performance does not by itself prove a lack of present intent[;]" there must be something more. *Id.* (citations omitted). The record presents no evidence, other than the fact of non-performance, that would indicate that either Joe Gilchrist's

or Tish Daly's promises were false when made. Accordingly, these promises cannot serve as the basis of Arsenal's claim for fraud.

### 4. Harbison Site Omission

Arsenal claims that it was fraudulent for the Defendants not to tell them that they had committed to a lease with the Harbison Site. Silence alone is not fraudulent absent a duty to speak. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 611-12 (3d Cir. 1995) (citing *Smith v. Renaut*, 564 A.2d 188 (Pa. Super. Ct. 1989)). A duty to speak typically only arises when the parties share a fiduciary or confidential relationship. *WP 851 Assocs., L.P. v. Wachovia Bank, N.A.*, No. Civ.A.07-2374, 2008 WL 114992, at *6 (E.D. Pa. Jan. 10, 2008) (citing *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999)). It is exceedingly rare in Pennsylvania for a duty to speak to arise between sophisticated business entities conducting an arm's length transaction. *Paramount Fin. Commc'ns, Inc. v. Broadridge Investor Commc'n Solutions, Inc.,* No. Civ.A.15-405, 2015 WL 4093932, at *5 (E.D. Pa. July 7, 2015); *see also Local 30, United Union of Roofers, Waterproofers and Allied Workers v. D.A. Nolt, Inc.*, 625 F. Supp. 2d 223, 230-31 (E.D. Pa. 2008) (finding that parties on opposite sides of the negotiating table had no duty to inform the other of the status of their negotiations with others).

Arsenal does not argue that any fiduciary or confidential relationship existed between the parties, and there is no reason why the Defendants were under any obligation to disclose to Arsenal their negotiations with a competing site. The parties were sophisticated business entities negotiating in an open and competitive environment, and, until a lease was signed, were free to abandon negotiations at any time. Because the Defendants were under no duty to speak, their decision not to tell Arsenal that they had committed to the Harbison Site was not fraudulent.

If Arsenal's factual allegations are accurate, Defendants' behavior during negotiations with Arsenal may deviate from a model of ethical behavior, and might cause any of the Wakerfern or the Ammons Defendants' present and future business partners to think twice before engaging in business with them, it cannot be said that their behavior was fraudulent. Accordingly, I will grant summary judgment on Arsenal's fraud claim in its entirety.

## IV.  CONCLUSION

For the reasons set forth above, I will grant Defendants' motion for summary judgment on Plaintiffs' promissory estoppel, tortious interference, and fraudulent misrepresentation claims. I will deny Plaintiffs' motion for summary judgment in its entirety.

**s/Anita B. Brody**

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                Copies **MAILED** on _____ to: